## BROADWELL et al. v. FLYNN et al.

No. 29786.   June 10, 1941.

Rehearing Denied Nov. 18, 1941.

*118 P. 2d 1029.*

Robert Burns and Sam S. Gill, both of Oklahoma City, for plaintiffs in error.

Frank G. Anderson, Calvin Jones, and Conrad C. Mount, all of Oklahoma City, for defendants in error.

CORN, V. C. J.   This is an action for the specific performance of an alleged oral contract between joint adventurers wherein the parties contemplated the formation and incorporation of a gas company for the purpose of supplying natural gas from the original oil field adjacent to Oklahoma City to industrial plants in and near the city.

The plaintiffs in error were the plaintiffs in the trial court, and for convenience the parties will be referred to herein in the order of their appearance in that court.

The plaintiffs allege that such oral agreement was entered into between themselves and Logan W. Cary and Streeter B. Flynn. Plaintiffs claim to have originated the idea and to have done some preliminary work on the project, such as contacting the local managers of the packing plants with the view of procuring contracts with them as customers of the proposed gas company; and further alleged that they induced Logan W. Cary, a gas engineer, to join the proposed company, and that

Streeter B. Flynn, an attorney and financier, also agreed to join the company, and that Mr. Flynn agreed to advance $50,000 to be used for labor, freight, pipe and other incidentals necessary to prosecute the work, said sum to be returned to him out of the sale of bonds, and that Mr. Flynn would cause a corporation to be formed and bonds would be issued against the contracts and properties of said corporation, and that as an inducement to purchasers of said bonds a bonus of 1,000 shares of stock was to be given to the purchaser of each $10,000 worth of bonds; that the corporation was to authorize the issuance of 50,000 shares of stock of no par value, and that after the issuance and sale of the bonds and the issuance of the bonus stock, all the remaining stock unsold or undelivered as bonus stock to the bondholders would be divided equally three ways between the parties: one-third to the Broadwells, one-third to Mr. Cary, and one-third to Mr. Flynn.

Plaintiffs alleged that the defendant Flynn, after coming into the enterprise and seeing the possibilities for great profits, entered into a conspiracy with the defendant Cary to eject the plaintiffs from the enterprise and to take over the venture for their own use and benefit; and that when all the parties were assembled in the law office of Mr. Flynn for the purpose of mutually considering, consulting, and advising about details and matters pertaining to the prosecution of the common enterprise, Mr. Flynn abruptly told the plaintiffs that he had gone as far in the enterprise with them as he would go, and that he was going to take it over and go alone with it, and that plaintiffs were out of any further connection with it, and that he would give each of the plaintiffs 1,000 shares of the common stock of the corporation which was to be formed for the services they had rendered to that date. Plaintiffs say that they did not agree to accept the stock in settlement of their interest in the enterprise; that the defendants did organize the corporation, construct the pipe line and issue the corporate stock and sell the bonds to

finance the company as originally planned, except that they were excluded from participation in it. The suit was brought to recover 8,000 additional shares, or money judgment in lieu thereof for $160,000.

The defendant Cary filed a lengthy answer detailing the negotiations which took place between plaintiff, himself, and the defendant Flynn, and denying all the allegations of plaintiffs' petition, except such as were expressly admitted by his answer. The contents of his answer, stated briefly, in substance, are as follows:

Sometime prior to July 20, 1929, and on different occasions, plaintiffs had suggested to Cary the advisability and feasibility of constructing a pipe line from the Oklahoma City field to the packing plants for supplying them and other industrial plants that might be available with natural gas, and proposed that Cary enter into the project with them and help finance the same and otherwise work out and complete the project. Plaintiffs represented they had assurances from the packing companies that contracts would be executed for the purchase of natural gas from the proposed pipe line, and relying upon these representations of the plaintiffs, Cary, on July 20, 1929, entered into negotiations with the defendant Flynn, in an effort to have him finance the project to the extent of $50,000 and agreed to have issued to him one-third of the capital stock of whatever the corporation might be organized for the purpose of building and operating the proposed pipe line. Flynn then informed him that he, Flynn, and Robert M. Rainey had been considering building a similar line to the Harrah and Belle Isle power plants of the Oklahoma Gas & Electric Company, but that one would not necessarily interfere with the other. Flynn, believing that Cary had contracts with the packing companies, agreed to finance the project to the extent of $50,000, and to accept one-third of the stock of the corporation as aforesaid. Flynn then arranged to purchase the gas from the Coline Oil Corporation

622

at its wells in the Oklahoma City field, provided satisfactory assurances could be furnished that the packing companies had executed contracts, or would do so as soon as same should be required. Cary then informed Flynn that the contracts with the packing companies had not yet been executed, but would be as soon as prepared and presented for that purpose. Cary arranged a meeting at his office between the plaintiffs and Flynn, and plaintiffs assured Flynn that the packing companies had agreed to execute the contracts and that all remained to be done was to forward them to Chicago for their execution. Flynn prepared the contracts and plaintiffs sent them to the Chicago offices for execution, and after waiting a considerable length of time for their return and not receiving them, another meeting was held and it was there decided that plaintiffs should send a telegram to the packing companies inquiring in regard to the contracts, and thereafter plaintiffs were informed by the packing companies that they had not agreed to execute the contracts and did not intend to do so. After a few days another meeting was held at Flynn's office, and Flynn informed Cary and plaintiffs that he was disgusted and was through with the project and would have nothing further to do with it. He then informed Cary and the plaintiffs that he and Rainey would go ahead with their project to Harrah and Belle Isle, but would not attempt to sell gas to the packing plants so long as plaintiffs and Cary had any intention of carrying out their proposed project. Cary informed the plaintiffs at that time that he was disgusted and through with the entire proposed project. At said meeting Flynn advised plaintiffs that if they should decide to abandon their proposed project and should be willing to allow the packing plants to be taken into the project which Flynn and Rainey had been considering, if such project should be carried out, he would be willing to give plaintiffs some stock in whatever corporation should be organized, as a consideration for plaintiffs giving up their proposed project. Plaintiffs at that time refused such offer and stated that they intended to go through with their project.

A few days later plaintiffs expressed the desire to Cary to again meet with Flynn, and Cary arranged the meeting at Flynn's office. At said meeting plaintiffs stated that they had decided they would not be able to go on with their proposed project and had decided to abandon same, and inquired of Flynn how much stock he would give them in whatever company he might organize, in consideration of plaintiffs abandoning their proposed project and allowing the same to be taken in as a part of the project the defendants Flynn and Rainey had been considering. Flynn then and there informed them that he he decided to go on with his proposed project. The plaintiffs then informed would be willing to give them 1,000 shares of stock each in whatever corporation he might organize, in the event Flynn that they were willing to accept his offer of 1,000 shares each of stock in whatever company he organized for carrying out said project, and the same was verbally agreed to by all the parties, and as evidence of said agreement all the parties present then and there shook hands.

Thereafter and in pursuance of said understanding, a corporation was organized under the laws of Delaware by the name of "Industrial Gas Company of Oklahoma," which said corporation constructed a pipe line to said packing plants and to the Belle Isle plant of the Oklahoma Gas & Electric Company, furnishing natural gas to said plants and to other smaller industries located along or near said line. That all the capital stock that was agreed to be issued to the plaintiffs was issued and delivered to them, and that defendant is not liable to plaintiffs in any manner whatever.

The answer of the defendant Flynn was substantially the same as that of the defendant Cary above set out. The answer of defendant Rainey was one of general denial.

The trial court held generally against the plaintiffs and for the defendants, and rendered judgment accordingly.

We take the view of the trial court that the whole case can be determined upon one proposition and one proposition alone, and that is: irrespective of whatever agreement was entered into between the parties, the plaintiffs agreed to accept 1,000 shares of the stock in the corporation in consideration of the services they had performed and get out. Both Mr. Flynn and Mr. Cary testified that such an arrangement and agreement was made, and Mr. Rainey testified that Mr. George Broadwell admitted to him that it was, but that he was not satisfied with the same. Broadwell denies that the agreement was made. Of course, these witnesses had an interest in the litigation, but there is other evidence in the record that indicates such agreement was made. Mr. Benson, a contractor, testified that Broadwell asked him to submit a proposition to the company for a contract to construct the pipe line, and at first they told him they were interested in the company and would not take a commission for procuring him the contract, as they would not steal from their associates, but later on told him that they were no longer associated with the enterprise and asked him to include in his estimate a broker's commission, which the contractor did, and paid them a commission amounting to more than $4,000. This the plaintiffs received in addition to the 2,000 shares of stock, which was shown to be of the value of $17.55 per share, and a total value of $35,100. Thus, it appears that the plaintiffs received $39,100 for the services they performed. The prospect of receiving these benefits from the offer of Mr. Flynn as against the prospect of being able to carry out a similar project of their own could well have been considered by the plaintiffs as a good inducement for their acceptance of the offer and for their agreement to withdraw from the enterprise. These and other circumstances appearing in the evidence throw the weight of the evidence on the side of the defendants.

The right of a party to terminate a contract of joint adventure is well settled. In Dike v. Martin, 85 Okla. 103, 204 P. 1106, this court said, in the body of the opinion at page 107:

"If any party to the joint adventure had refused to substantially perform his obligation, his associates might terminate their relation with him and carry out the enterprise to his exclusion, and if for this or any other valid reason they chose to terminate the relationship, they could do so only by giving notice to him that the relationship was then and there ended. Saunders v. McDonough, 67 So. 591 (Ala.)."

In the case of Saunders v. McDonough, 67 So. 591, the Alabama court said:

"It could, of course, have been terminated by mutual agreement. And, if one of the parties had refused to substantially perform his obligations in the premises, his associates could undoubtedly have either terminated their relations with him, and themselves carried on the enterprise to his complete exclusion, with an action against him for damages for his breach (Yeager's Appeal, 100 Pa. 88; McCreery v. Green, 38 Mich. 173; Davidor v. Bradford, 129 Wis. 524, 109 N. W. 576; McIntire v. Carr, 164 Mich. 37, 128 N. W. 1079); or they could hold such defaulter to the obligations of his contract, and sue him for money or property agreed to be contributed to the common fund or to be supplied for a specified purpose (Pillsbury v. Pillsbury, 20 N. H. 90; Finlay v. Stewart, 56 Pa. 183; Armstrong v. Henderson, 99 Va. 234, 37 S. E. 839)."

See, also, Knight v. Cecil, 110 Okla. 57, 235 P. 1107.

If the plaintiffs were unable to perform the services they proposed to render, and their lack of ability to perform them was a burden upon the enterprise, as the defendant Flynn contended at the time of breaking off relations with them, then the defendant Flynn had the right to terminate the relationship by any lawful means.

In an action of equitable cognizance the presumption is in favor of the finding of the trial court, and it will not be

624

set aside unless the same is against the clear weight of the evidence; and, where the finding of the trial court is general, such finding is a finding of each special thing necessary to sustain the general judgment. Williams v. Downing, 185 Okla. 633, 95 P. 2d 612; Smith v. Beam, 176 Okla. 408, 55 P. 2d 980; Noble v. Bodovitz, 175 Okla. 432, 52 P. 2d 1046.

The judgment of the trial court is affirmed.

RILEY, GIBSON, HURST, and DAVISON, JJ., concur.