David L. FOSTER, Plaintiff in Error,

v.

Daniel D. GRIDLEY, Defendant in Error.

No. 41227.

Supreme Court of Oklahoma.

April 5, 1966.

Wheeler & Wheeler, J. Warren Jackman, Tulsa, for plaintiff in error.

Farmer, Woolsey, Flippo & Bailey, J. C. Farmer, Robert J. Woolsey, Otho Flippo, J. B. Bailey, Lawrence A. G. Johnson, Richard L. Harris, Richard E. Wright III, Tulsa, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an attempt by plaintiff in error, hereinafter referred to as "plaintiff", to enforce an oral agreement, evidenced by written memoranda, he had with defendant in error, hereinafter referred to as "defendant", for the two to effect the purchase of the Seven Up Bottling Company of Tulsa, Inc., and organize a new corporation to own and operate it.

Plaintiff and defendant entered into their agreement on February 4, 1963. After defendant and others thereafter purchased said Seven Up Bottling Company, on July 3, 1963, plaintiff commenced the present action against defendant, the same month, praying for specific performance of his agreement with defendant. In defendant's answer, he alleged, among other things, that the agreement was not one that could be enforced by specific performance.

Evidence introduced at the trial before the court without a jury, in May, 1964, established, among other things, that all

shares of stock in the Seven Up Bottling Company of Tulsa, Inc., were owned by Joe D. Branham and Blanche M. Branham, his wife; that, after plaintiff and defendant wrote a memorandum they termed a "GENERAL BASIS" of the agreement between them, for the purchase of the Branhams' stock, to be assigned to a new corporation the two were to organize, they went to the office of the firm of attorneys, that represent defendant herein, and engaged one of the firm's members, Mr. Jack B. Bailey, to draft a contract termed an "Agreement", dated February 4, 1963, with Mr. and Mrs. Branham for such purchase of their stock. This proposed contract was rejected by Mr. Branham and never signed, Mr. Branham saying that he had decided not to sell. A short time later, defendant procured Mr. "Andy" L. Springfield to contact Mr. Branham, who then changed his mind and again became interested in selling the company. After the resumption of negotiations for the sale, and after more than one attempt, during succeeding months, to "work out" a sale that would be satisfactory to Mr. Branham, most of the terms of the sale were agreed upon about June 18th or 19th, 1963, and the agreement was thereafter consummated in the purchase of the Seven Up Bottling Company of Tulsa, Inc., on July 3, 1963, by defendant, for and with, a new company then to be incorporated as "Seven Up Company of Northern Oklahoma, Inc.", in which defendant and certain third parties were to own all of the stock.

At the close of the evidence, the court took the case under advisement and thereafter, on July 28, 1964, filed a written "DECISION" in which he found, among other things in substance, that, by the terms of the agreement plaintiff and defendant had with each other in early February, 1963, the total consideration for the purchase of the Seven Up Bottling Company from the Branhams was to be $407,-613.73, to be derived from the following sources: (1) By plaintiff and defendant

each paying $50,000.00, or a total of $100,-000.00, in cash, (2) By defendant lending the new company to be organized, an additional $100,000.00 at an interest rate of 4% annually, and (3) By paying the balance in installments on promissory notes to be executed and delivered to the Branhams by the new corporation; that defendant was to be president of the proposed corporation at an undetermined salary; that plaintiff was to be said corporation's vice-president and general manager at a salary of $1250.00 per month; that when plaintiff and defendant caused a contract embodying those terms to be drafted and presented to Joe Branham, he "turned the deal down, refusing to enter into any contract where any former employee, or particularly" plaintiff, was involved; that thereupon the agreement between plaintiff and defendant terminated, and no contract was proved to have thereafter existed between them; that the contract under which the Tulsa Seven Up corporation was sold, after that date, was a different contract, with different parties, and a different consideration, amounting to $40,000.00 more than that of the contract of February 5, 1963.

In said "DECISION", the trial court concluded that there was no contract between plaintiff and defendant after February 5, 1963, "that could be enforced by specific performance." In accord therewith judgment was rendered for defendant, upon the specific finding that plaintiff had not sustained the allegations of his petition. After the overruling of his motion for a new trial, plaintiff perfected the present appeal.

In the opening remarks of his argument for reversal, plaintiff takes the position that the question of whether Branham's rejection of the proposed contract he and defendant submitted to Branham on February 5, 1963, brought an end to plaintiff's and defendant's agreement, is one of fact, and, by way of attempting to show that the trial court erred in its judgment, plaintiff argues that the parties' agreement between themselves survived said rejection;

and was in full force and effect "until breached by defendant on June 18, 1963."

Under "PROPOSITION I" of his answer and reply briefs, defendant points to testimony in a deposition taken from defendant, and to other testimony he gave at the trial, to the effect that plaintiff and defendant continued to see each other regularly and they talked about the prospects and status of negotiations with Branham for the purchase of the Seven Up Company, after Branham's rejection of the proposed contract they submitted to him in February, 1963, and until Attorney Bailey advised defendant not to talk to plaintiff about it any more, and to various contacts and communications he had with defendant both before, and after, it became certain that the Branhams would sell their stock to a corporate set-up with which plaintiff had no connection. Plaintiff's counsel concedes that these "admissions" are insufficient in, and of, themselves to show that the new negotiations with Branham (after it was ascertained through Springfield that it might be possible to devise some arrangement for the purchase of the Seven Up Company from Branham and his wife) were pursued on the basis of the plaintiff's and defendant's original agreement. But they say that said admissions "when blended with ingredients supplied by the other evidence in the case, stirred with common sense, established beyond any question that the intent of both parties was to purchase" the company on that basis. We do not agree.

The evidence shows that when plaintiff and defendant began their contacts through working for Branham's Seven Up Bottling Company, defendant was little more than 21 years of age; his guardianship, necessitated by a substantial inheritance from his deceased father, had only recently been terminated; he was a "pre-law and management" junior student at Tulsa University; and the airplane he flew was being rented to the Seven Up Company for chartered trips. Plaintiff, on the other hand, had had 10 or 11 years of experience in the Seven Up Company when the Branhams purchased it in 1962, and was the Company's vice-president and general manager, at a salary of $1250.00 per month. Mr. Branham testified that he was "in charge" of the Company "a hundred percent * * *". These facts, together with Mr. Branham's further testimony that plaintiff had looked after the construction of a country home for him and that he had handled all of Branham's "affairs" since the Branhams purchased the Seven Up Company, indicates that plaintiff was a man of considerable business experience. Defendant testified that he had $70,000.00 or $80,000.00 in cash and in the stock market from his inheritance, but when asked if he had any business experience he testified: "No, sir, not really." He further testified that his interest in the purchase of the Seven Up Company was initiated by an inquiry from plaintiff, together with plaintiff's recommendation of it as "a good business deal." Evidence, such as the foregoing, when considered with the evidence that plaintiff and defendant had frequent social contacts, lends credence to defendant's testimony that the reason he continued to discuss the negotiations for buying the Seven Up Company after Branham had, in February, 1963, rejected the proposed contract to which plaintiff was a named party, was because plaintiff "was a friend and I considered him as such and he knew a little bit about the operation and his advice would be appreciated if he wanted to give it to me." We think the further fact that defendant, after his and plaintiff's proposal to Branham was rejected in February, enlisted the aid of Mr. Springfield, who was one of his University professors, for assistance and advice in helping him find a bottling business in which to invest his capital, was indicative of the defendant's recognition of his own limitations in business experience and his need for relying on the advice of older and more experienced minds in that field. It taxes our credulity to believe that a man of plaintiff's business experience could be lead to believe that in defendant's negotia-

tions of May and June, 1963, he was acting even in partial execution of the two parties' agreement of February, especially after he had learned that Branham would not sell to any organization of which he was a part, and defendant had described to him the final contract the Branhams were about to sign that would effect a vastly different kind of a sale than was contemplated by plaintiffs' and defendants' earlier agreement. In this connection, the following excerpt from plaintiffs' testimony is quite revealing:

"Q  (By Mr. Wheeler) I hand you what has been marked plaintiff's Exhibit 12 and ask you to state what it is, please, sir?

"A  This is the closing contract between Dan Gridley and the Seven-Up Bottling Company of Tulsa.

"Q  Under what date?

"A  On the 18th day of June, 1963.

"Q  Now, Mr. Foster, did Mr. Gridley discuss this contract with you immediately before it was signed?

"A  Yes, sir, he did.

"Q  Where were you?

"A  We were at my place at Grand Lake.

"Q  Did he bring it with him?

"A  No, sir, he did not.

"Q  But he told you what its provisions were; is that correct?

"A  Yes, sir.

"Q  And did he tell you anything about when it was to be executed?

"A  Yes, sir.

"Q  And what did he say?

"A  On the 18th day of June.

"Q  Now then, did you have a meeting with Mr. Gridley immediately after that?

"A  Yes, sir, I did.

"Q  Where was it?

"A  At Mr. Gridley's home.

"Q  And who was present?

"A  Dan and myself.

"Q  Now, what transpired at that meeting?

"A  I read the closing contract where it was signed and the deposit had been made. I read the contract over and agreed to it and asked Dan when we got the rest of the closing. Joe Branham called about that time and Dan had to leave and go to a meeting. So I went back the next morning, read the contract again, went over it some more, and asked Dan when we were going to put up our money and go down and make our stock division, and that was the first indication that I had had that Dan was not going to honor our contract.

\*       \*       \*       \*       \*       \*

"At one o'clock that afternoon, he called me and said that he had been advised by his counsel not to talk to me any more. So Jack Bailey then called me. I met Jack Bailey at five o'clock that afternoon and talked to Jack about this contract. He at that time told me that he wasn't aware that I was still in the deal, that Dan had told him that he was doing it alone, that he was buying the company alone.

"Q  Now, Mr. Foster, the contract, plaintiff's Exhibit 12, that you have before you, does not contain your name, does it?

"A  No, sir.

"Q  Yet you approved that contract in your discussions with Mr. Gridley before it was executed?

"A  Yes, sir.

\*       \*       \*       \*       \*       \*

"Q  (By Mr. Wheeler) Why did you approve the contract without your name being in it?

\*       \*       \*       \*       \*       \*

"A  I had been told by Dan that I could—that Joe wouldn't sell it to me or if I was going to be a part of it, but I had also been advised by Dan and Jack Bailey had taken care of this provision, that once we had their signatures on the contract, that there wouldn't be anything that he could do about it.

"Q (By Mr. Wheeler) Did Dan assure you at that time that you were in the deal?

"A Yes, sir, he did.

"Q Now then, Mr. Foster, at that late date, did you have any discussions with Mr. Gridley about when it would be necessary for you to provide your $50,000?

"A Yes, sir, I did.

"Q Tell the Court about that, please.

"A I told him it looked like I'd better get busy and get my money together, and he said it wouldn't be necessary until September 1st because that was when the last additional $100,000 down payment was to be made, was September 1st; that I had until then to get my money together.

THE COURT: Now, when did he tell you that?

"A On about the 15th day of June.

"Q (By Mr. Wheeler) About three days before this contract was signed?

"A Yes, sir."

When Jack Bailey was on the witness stand, he denied that he had ever told defendant, or anyone else, that if, after Branham had signed the contract referred to in the above quoted testimony, he discovered that plaintiff was connected with the purchasing corporation " * * * there wouldn't be anything he could do about it." And, on the witness stand, defendant testified that Bailey had never made any such statement to him. He also testified that he had never told plaintiff any such thing.

Defendant's testimony also established that he had submitted one contract, dated May 27th, 1963, to Branham for the Seven Up Company's purchase, with an attached letter assuring Branham that if he should purchase, and assume operation of, the Company, plaintiff would not be employed in any capacity. Defendant also testified that he showed this to plaintiff at his home about the same date. In his deposition, defendant admitted that he "could have" informed plaintiff on a Saturday evening at the latter's Grand Lake cabin in June, 1963, that Mr. Branham had increased the price for his sale of the Seven Up Company $40,000, and that, in the course of this conversation, the subject of plaintiff's getting together $50,000 (for the purchase) was discussed. Defendant also testified that, on that occasion, he "could have" told plaintiff he had plenty of time to do this "because Branham didn't want the last 100,000 until September 1st, '63." On the witness stand, defendant denied that he ever had any agreement with plaintiff to share with him the above mentioned increased price the Branhams asked for, and obtained, through the May and June negotiations.

█ Whether defendant ever lead plaintiff to believe, as late as June, 1963, that, if he raised $50,000, all or any part of the parties' February agreement could still be carried out, and that, if defendant told plaintiff what plaintiff testified to concerning that, such statements were sufficient to establish that the parties' earlier agreement was still in effect, operative, and enforceable were questions for the trial court to decide. After carefully reviewing the record in this case, we cannot say that said court's judgment unfavorable to plaintiff on those issues is either contrary to law or clearly against the weight of the evidence.

█ Conflicting conclusions may also be drawn from the evidence as to whether the termination of plaintiff's employment by the Branhams' Seven Up Company on or about May 1, 1963, was any part of plaintiff's agreement, or arrangement, with defendant (so as to constitute part performance of it, as is argued in plaintiff's PROPOSITION II or constituted an element of equitable estoppel, as is argued in his PROPOSITION III). Plaintiff testified that on a trip that he, and an "accountant-attorney" named Don Atkins, and defendant, made to St. Louis, Missouri, in defendant's airplane on January 31, 1963, the defendant first asked him to quit his

job with the Seven Up Company on the theory that this would "leave" Branham "without management" and "he would have to sell" the company. He further testified that defendant told Ed Hendricks, Seven Up's sales manager, "on the next evening back" from that trip (which would have been February 1st or 2nd) when these three gentlemen were in plaintiff's office, that he (defendant) had made such a request of plaintiff. This testimony was corroborated by Hendricks. The portion of defendant's deposition concerning this, and read into the record at the trial, was as follows:

"Question: * * * Now, Mr. Gridley, did you ask Mr. Foster to leave his employment with the Seven-Up Bottling Company of Tulsa? Answer: Yes, sir. Question: When did you do that? Answer: Approximately the spring of that year, '63. Question: Well, some time following the February 4 rejection; is that right? Answer: Yes, sir.

 * * * * * *

"Question: What was the reason for that? Answer: I wanted to go and purchase—discuss the possible purchase and possible negotiations for other plants. Question: Did you tell Mr. Foster you believed if he left, it would force Branham into a sale of his interest? Answer: No, sir."

Defendant's testimony at the trial differed in no material respect from that quoted above, but it indicated additionally that two other bottling plants plaintiff and defendant were thinking about investigating for possible purchase were the Pepsi Cola plant at Wichita, and the Seven Up plant at Muskogee.

■ Joe Branham's testimony indicated that plaintiff's giving up his position with the Tulsa Seven Up Corporation was precipitated by a heated conversation he had with him while Branham was hospitalized in March, 1963. Branham testified that plaintiff came to his hospital room with Jack Tubbs, an "advertising man", after Branham had received a long distance telephone call from a friend, Mr. Ridgeway, in the parent Seven Up Company's St. Louis office wanting to know why the Tulsa Company was not advertising its product. According to Branham's testimony, plaintiff indicated he was quitting during the course of Branham's questioning him about this. The gist of other testimony by Branham was that after plaintiff left the company, and he (Branham) "took over" its management on April 1st, plaintiff came back, and he rehired him briefly, and then discharged him for disobeying a direction about hiring a secretary. While plaintiff testified, in substance, that his employment by Branham's Seven Up Company would not have terminated if it had not been for his agreement with defendant, we have carefully examined all of the evidence pertinent to this subject and have concluded that whether this occurred, *pursuant to, or by reason of*, the subject agreement with defendant, was properly an issue for the trial court to resolve. It was a question upon which plaintiff's testimony was not binding on that court (see Alexander v. Gee, Okl., 352 P.2d 915); nor was the other evidence introduced on his behalf conclusive of his right to prevail, since conflicting inferences and conclusions might have been reasonably drawn from evidence introduced on defendant's behalf.

■ After weighing the evidence as a whole, we cannot hold that the trial court's findings and judgment are clearly against its weight. Therefore, under the rule of appellate review applicable to cases such as this one, said judgment must be affirmed. See Noble v. Burnet, Okl., 294 P.2d 301, and Broadwell v. Flynn, 189 Okl. 620, 118 P.2d 1029. It is so ordered.